

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

GRADILLAS COURT REPORTERS, INC.,

      Plaintiff,

v.                                 Action No. 2:17cv597

CHERRY BEKAERT, LLP, et al.,

      Defendants.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

This matter comes before the Court on a motion for summary judgment filed by defendants Cherry Bekaert, LLP, and Sara Crabtree.[1] ECF No. 62. The motion was referred to the undersigned United States Magistrate Judge on August 7, 2018, pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). ECF No. 71. For the reasons discussed below, the undersigned recommends that the motion for summary judgment be **GRANTED**.

### I.    PROCEDURAL BACKGROUND

On May 16, 2017, plaintiff, Gradillas Court Reporters, Inc. ("GCRI"), filed a two-count complaint against Cherry Bekaert, LLP ("Cherry Bekaert"), Sara Crabtree ("Crabtree"), and "Does 1 through 50, inclusive" in the Superior Court for the District of Columbia. Complaint ("Compl."), ECF No. 1-2. The complaint alleges that defendants breached a contract to provide accounting and government contracting services to GCRI and committed "[p]rofessional

---

[1] Notwithstanding that her legal name is Sareit Crabtree, ECF No. 69-21 at 4 (9:22–10:9), the Court adopts the nomenclature used by the parties and in the caption of the case.

[n]egligence" in conjunction with the untimely submission of GCRI's bid for a contract with the Securities and Exchange Commission ("SEC"). Compl. ¶¶ 56–69.

Defendants Cherry Bekaert and Crabtree (hereafter "defendants") removed the case to the United States District Court for the District of Columbia on June 14, 2017, ECF No. 1, and subsequently moved to dismiss the case for lack of venue and jurisdiction, or to transfer the case to the Eastern District of Virginia. ECF No. 11. Following a hearing on October 6, 2017, the court granted the motion to transfer the case to the Eastern District of Virginia. ECF No. 16.[2] Defendants answered the complaint on November 27, 2017. ECF No. 24.

On January 18, 2018, GCRI moved for partial judgment on the pleadings against the defendants on its breach of contract claim. ECF No. 37. By report and recommendation dated March 2, 2018, United States Magistrate Judge Douglas E. Miller recommended that GCRI's motion be denied, but that defendants' affirmative defense alleging GCRI's failure to mitigate damages be struck. ECF No. 45 at 1–2. The Court adopted and approved Judge Miller's findings and recommendations on April 2, 2018. ECF No. 52.

On July 17, 2018, defendants moved for summary judgment on four grounds. First, defendants argue that GCRI's contract with Cherry Bekaert expressly bars claims for consequential damages, like the $12,205,421.00 in lost profits sought in recovery for counts one and two. ECF No. 63 at 13–18; Compl. ¶¶ 51, 62, 69. Second, defendants claim entitlement to judgment as a matter of Virginia law because GCRI's claims "are so speculative and contingent that they cannot form the basis of any cause of action," ECF No. 63 at 18, and the opinions of government contracting experts cannot remedy this deficiency, id. at 26–28. Third, defendants claim that, in the absence of a duty owed to GCRI independent of any contractual relationship,

---

[2] The court also denied GCRI's combined motion to stay, to reconsider its decision to transfer, and to certify an interlocutory appeal. ECF No. 21.

no claim of professional malpractice or negligence can survive. *Id.* at 28–29. Finally, defendants argue that Crabtree, as a Cherry Bekaert employee, is entitled to judgment as a matter of law on both claims because she was neither a party to any contract nor liable in her personal capacity for any breach of professional services. *Id.* at 29–30.

GCRI filed a response in opposition to defendants' motion for summary judgment on July 31, 2018, ECF No. 64, and defendants replied thereto on August 6, 2018, ECF No. 70. Thereafter, the Court permitted GCRI to supplement the factual record on September 24, 2018, with evidence of a new contract award to GCRI by the SEC, and authorized the defendants to file a sur-reply on September 26, 2018. ECF Nos. 74–75, 79, 82.

On October 16, 2018, the Court heard oral argument on the motion for summary judgment. Don Howarth, Esq., Suzelle M. Smith, Esq., and Robert M. Tata, Esq., represented GCRI. J. Peter Glaws, IV, Esq., represented defendants. The court reporter was Rebecca Braley. As the matter is fully briefed and has been argued, it is ripe for decision.

## II.    FACTUAL BACKGROUND

The following facts have been gathered from the pleadings, the parties' factual recitations for and in opposition to summary judgment, and the exhibits appended to the summary judgment filings, including excerpts of deposition testimony. Where there are inconsistencies among these sources, the Court recounts the facts in the light most favorable to GCRI.

### A.    GCRI and Cherry Bekaert's March 27, 2012 Letter of Engagement

Josephine Gradillas ("Gradillas"), a resident of Los Angeles, California, founded GCRI in 2001 and is its sole owner. ECF No. 67 at ¶¶ 1–2. GCRI is in the business of providing court reporting and transcription services, and providing private copies of the same to parties for a fee. *Id.* at ¶ 4.

3

After seeing advertisements for Cherry Bekaert's accounting and government contracting services, in late March 2012[3] Gradillas contacted Cherry Bekaert[4] seeking assistance for her business. Compl. ¶¶ 10–12, 14–17; ECF No. 63-1 at 1–2. This contact led to the entry of a "letter of arrangement" between GCRI and Cherry Bekaert. ECF No. 63-2 ("engagement letter").

The typewritten engagement letter, dated March 22, 2012 and set forth on Cherry Bekaert letterhead, was signed by John Carpenter as "engagement principal" for the firm. *Id.* at 1, 4. The terms of the letter are described in detail below. The next day, "Government Consultant" Crabtree sent Gradillas an e-mail forwarding a copy of the "general consulting engagement letter [outlining GCRI's] working relationship" with Cherry Bekaert, and identified herself as "the primary consultant assigned to support you . . . ." ECF No. 63-1 at 1.

On March 27, 2012, Gradillas signed, dated, and accepted the terms of the engagement letter in her role as GCRI's president. ECF No. 63-2 at 4; ECF No. 63-3 at 6 (249:12–250:5).

B.   **The Engagement Letter's Material Terms**

The opening paragraph of the engagement letter indicates Cherry Bekaert will serve "as consultants" for GCRI, identified as "the 'Company,'" and recites that the letter "sets forth the nature and scope of the services [to be provided], the related fee arrangements and other terms and conditions designed to assure that [the] services are performed to achieve mutually agreed upon objectives." ECF No. 63-2 at 1. Although identifying John Carpenter as engagement

---

[3] The complaint references March 2013, Compl. ¶ 17, but the emails between Gradillas and Carpenter indicate that this occurred in 2012. ECF No. 63-1.

[4] In March 2012, Cherry Bekaert operated under the name of Cherry, Bekaert & Holland, L.L.P. ECF No. 63-2 at 1. By application for a certificate of amendment filed with the Secretary of State for North Carolina on December 17, 2012, the partnership moved to amend its name to Cherry Bekaert, LLP. ECF No. 63-7 at 1–3. This amendment took effect on January 1, 2013. *Id.* at 3.

4

principal, the letter states that "[t]he actual personnel who perform the work will vary depending on the areas of expertise . . . [needed] to complete the engagement." *Id.*

In summarizing the services to be provided, the engagement letter indicates that Cherry Bekaert "will provide general consulting and accounting assistance as requested by the Company[,] [which] . . . consulting assistance may include, but not be limited to, general accounting assistance, advising on pricing and indirect rate structures, advising on general government contract matters and proposals, advising on tax matters, and other areas as mutually agreed." *Id.*

With respect to fees, the engagement letter provides that "fees for the services described above are generally based on the time spent at [Cherry Bekaert's] established hourly rates, adjusted for other appropriate factors, including the difficulty of the assignment, the experience of the professional expertise of the personnel assigned, time limitations imposed, risks and responsibilities the work entails, and the value of our services." *Id.* at 3. Further, it recites that such fees "will be billed periodically as charges are incurred and . . . invoices are payable on presentation." *Id.* The engagement letter then recites hourly rates, "currently effective . . . through August 1, 2012," for various types of Cherry Bekaert personnel ranging, for example, from $140.00–$210.00 for a "Staff/Senior Accountant" up to $300.00–$395.00 for a "Partner/Principal." *Id.* Beneath this generic listing, the engagement letter also identifies hourly rates for two specified Cherry Bekaert personnel: Sara Crabtree at $265.00 and John Ford at $350.00. *Id.*

Beneath the heading of "STANDARD TERMS AND CONDITIONS," the engagement letter also contains eight sub-headings and paragraphs, some of which are noted below. *Id.* at 2–3. With respect to the "Nature of Engagement," the letter recites that Cherry Bekaert "will not

5

audit or review financial information and will not express an opinion or any form of assurance on it." *Id.* at 2.

Under the sub-heading titled "Limitation on Damages," the engagement letter provides that "[i]n no event shall either [GCRI] or [Cherry Bekaert] be liable for consequential, special, indirect, incidental, punitive, or exemplary damages, costs, expenses or losses in an excess of [Cherry Bekaert's] fees." *Id.*

Beneath "Services," the engagement letter recites that Cherry Bekaert's "services may include advice and recommendations; but decisions in connection with the implementation and communication of such advice and recommendations will be [GCRI's] sole responsibility." *Id.*

Under "Term," the engagement letter recites that "[u]nless terminated sooner in accordance with its terms, this arrangement shall terminate on the completion of [Cherry Bekaert's] services hereunder. This arrangement may be terminated by either party at any time by giving written notice to the other party not less than thirty calendar days before the effective date of termination." *Id.* at 3.

**C.      Services Provided After Endorsement of the Engagement Letter, but Before 2017**

After acceptance of the engagement letter, Cherry Bekaert and Crabtree initially worked on assisting GCRI to obtain a General Services Administration ("GSA") certification and placement on a GSA schedule of candidates available for government contracting work. ECF No. 63-3 at 6 (250:6–251:7); ECF No. 63-1 at 1–2.  Crabtree and Cherry Bekaert mostly concluded this work on December 7, 2012. ECF No. 63-4 at 1–3 (telling Gradillas, "you are all set; anyone searching GSA Advantage will now see you!").

That same day, Gradillas inquired about Crabtree's availability, around New Year's Day, to review a draft proposal Gradillas was hoping to work on for "an offering in Fedbizopps

6

coming out on Dec[ember] 24th." *Id.* at 1. Although Crabtree promptly indicated that she was available to do this work, Gradillas later informed her, on January 10, 2013, that the solicitation in question "was really too small." *Id.* at 13.

Instead, on January 10, 2013, Gradillas requested Crabtree's assistance with reporting fourth quarter 2012 sales to GSA and troubleshooting GCRI's listing in the Dynamic Small Business Search ("DSBS") system, and Crabtree agreed to do these tasks. *Id.* at 6–7. After checking on the latter issue, on January 10, 2013, Crabtree advised that GCRI's account and profile were complete, that her search of the DSBS system revealed the profile, and provided confirmation of the same to Gradillas. *Id.* at 8, 10–12. On January 11, 2013, Crabtree submitted GCRI's fourth quarter sales data to GSA and provided confirmation of the same to Gradillas. *Id.* at 13, 16.

In 2014, among other tasks, Crabtree assisted Gradillas and GCRI with preparing and submitting a bid to provide domestic court reporting services to the SEC.[5] ECF No. 64 at 11–12, ¶ 3; ECF No. 63-3 at 5 (133:16–135:1). The SEC awarded this contract to Behmke Reporting and Video Services ("Behmke"), rather than GCRI. ECF No. 63-3 at 5 (133:16–134:6); ECF No. 63-6 at 4 (18:17–19:8); *see also* ECF No. 69-17 at 2.

During the latter part of 2015, in conjunction with GCRI's work for the Food and Drug Administration ("FDA") and with the agreement of Gradillas, Crabtree began identifying herself as GCRI's contract manager when dealing with federal agencies. ECF No. 69-20 at 5 (334:4–21) (noting that Gradillas assented and told Crabtree "I want you to do everything. Please handle it all."); ECF No. 69-21 at 12 (244:11–16).

---

[5] Although Gradillas testified at deposition that Crabtree submitted the 2014 SEC bid proposal, ECF No. 69-20 at 5 (332:14–333:2), Crabtree testified at deposition that she did not recall submitting the bid in question. ECF No. 69-21 at 7 (99:24–100:16) (noting that she "assisted with the pricing . . . spreadsheets").

In performing the tasks described above and others reflected in Cherry Bekaert's time-keeping records, Crabtree logged hundreds of time entries in 2013, 2014, 2015, and 2016 for work performed for GCRI. ECF No. 63-5 at 2–5. These entries included, for example, listings for "FDA support," "[f]ormatting assistance for proposal," "call with Josephine re: int'l tax issues and payment plan," "[r]eview FDA project cash flow w Sara [r]evisions to model," "EEOC proposal," "2015 GSA IFF reporting," "FDA contract support," "DOL BPA proposal," "SBA 8(a) audit support," "Army Ft. Bliss BPA quote," "NRC [s]olicitation review," "NRC proposal," "FERC proposal," "NNSA DOE proposal," "GSA 4th quarter 2014 IFF submission," "DOJ security review," etc. In the years preceding 2017, Crabtree logged well over 300 hours working on tasks for GCRI, and Cherry Bekaert billed GCRI over $100,000 for such services. *Id.* at 1–5.

Over time, the fees charged by Cherry Bekaert for Crabtree's time increased. Prior to August 1, 2012, *see* ECF No. 63-2 at 4, Cherry Bekaert billed her time at $265.00 per hour. ECF No. 70-1 at 1. By November 2012, this rate increased to $280.00 per hour. ECF No. 70-2 at 1. And, in March 2017, Cherry Bekaert charged $325.00 per hour for Crabtree's services. ECF No. 70-3 at 1–2. In e-mails from March 2017, Crabtree identified her title within Cherry Bekaert as "Senior Manager – Government Contractor Services." *See, e.g.,* ECF No. 63-17 at 1.

**D.    The 2017 SEC Solicitation and GCRI's Relationship with Defendants**

On February 10, 2017, the SEC issued a solicitation for a contractor to provide worldwide deposition and transcription services for a base year commencing June 26, 2017, and four ensuing possible option years. ECF No. 63-9 at 1–4, 10, 15 (specifying that SEC sought "a qualified woman-owned small business contractor to provide" said services to SEC headquarters and 11 regional offices pursuant to an "Indefinite Delivery, Indefinite Quantity" contract for the

base period and subsequent option periods, "if exercised"). The solicitation directed interested

bidders to submit, not later than noon on March 17, 2017 (Eastern Standard Time): (a) a Volume

I technical proposal directed to "the technical requirements of the solicitation document"; and (b)

a Volume II price proposal, with various attachments directed to pricing for the base and possible

option years. *Id.* at 35–40.

By e-mail dated February 22, 2017, Gradillas notified Crabtree about the solicitation.

ECF No. 63-8. The e-mail stated, in pertinent part:

> I use the query of 561492. SEC has posted SECHQ117R0005 for worldwide
> reporting. I would like to offer our proposal. The Response Date i[s] March 17,
> 2017. One of the questions I would have – if they invite emails – is where will
> the depositions and/or hearings take place? What cities and countries. They list
> only Toronto, Canada and Georgia. Please let me know what info you need from
> me – anything in the way of drafts and of course past experience. I will start a
> draft on all work we have done for the SEC out of country. They have a special
> 'Go/NoGo factor' attached. I will start a draft for you to look at, detailing this
> requirement. Thank you so much, Josephine.

*Id.* (removing e-mail formatting).

At deposition, Gradillas testified she communicated with Cherry Bekaert by telephone on

or about February 22, 2017. ECF No. 69-19 at 6 (123:6–13). Gradillas indicated this

conversation preceded the e-mail because, in the first sentence of the e-mail, Gradillas references

the "NAICS code to help [Crabtree] locate the – the specific proposal." *Id.* at 6 (121:2–8).

Gradillas then denied remembering anything further about this call. *Id.* at 6 (121:9–11). Soon

thereafter, however, Gradillas responded as follows:

> Q.        [] Did you have any verbal discussion with anybody at Cherry Bekaert
> around this time, around February 22, couple days before, couple days after, about
> Cherry Bekaert doing the work on the – on the solicitation?
>
> A.        Yes. I believe the conversation preceding the e-mail was a discussion just
> about that –
>
> Q.        And in any of those –

9

A.      – to offer the work to them so that they could prepare the proposal for us and that they would submit it and that they would send a bill and that we would pay it. I wanted that proposal to be done because it was huge. I remember that. I thought it was absolutely worldwide. It was huge.

Q.      Okay. In those conversations in that time frame around February 22 with Cherry Bekaert, did you discuss what would be the rates that they would charge you for the work you wanted them to do?

A.      I do not recall that.

Q.      You – do you specifically recall saying to someone at Cherry Bekaert in that time frame that you would pay them for that work?

A.      My recollection is that, in the telephone conversation, I did say I want you to do this bid. I want you to work on it, prepare it. It's big, big bid – excuse me – large bid. I would want – I'll show you where it is in FedBizOpps. I remember it was there. And I would like you to do it, and absolutely send me a bill, and we'll pay it. I always was very interested in having this done. This – this was a huge bid, and it was high priority for me.

*Id.* at 6 (123:6–124:18).[6]

On February 24, 2017, Gradillas again e-mailed Crabtree about the SEC solicitation

stating, in pertinent part:

I believe we have in the past sent in a proposal dealing with the 12 domestic regional offices of the SEC. If you do not have it handy, I can easily send to you. Also, would like to have a plan on the timing of our written proposal for this. The target date is Friday, March 17, 2017. I would very much like to have the final 2 to 3 days before, so that I have ample time to really comb thru it. This is going to be a significant award. I almost got it last time. Please let me know what I can send you vis-à-vis drafts. I will, of course, fill in the pricing and send to you as a draft. Thank you so much for being there on this . . . especially!

ECF No. 63-10 (removing e-mail formatting).

---

[6] In testifying about Crabtree's role in GCRI's competitive bids to government agencies for similar solicitations, Gradillas stated: "Sara would prepare the proposal. She would have a final. She would send it to me so that I could read it, make any changes. I would do that quickly. I would send it back to her. She would incorporate those changes, and then she would submit the . . . proposal." ECF No. 69-20 at 6 (361:12–22); *see also* Compl. ¶ 57 (GCRI "and Defendants had a course of business dealings over many years whereby Defendants agreed to and provided competent accounting and government contracting services, advising and submitting bids for government contract work and [GCRI] paid Defendants for this work").

Crabtree responded that same day and, after discussing a modification request to another GCRI contract, apparently referenced the SEC solicitation by stating, "I have not looked at the new proposal you want, but will get to that soon." ECF No. 69-23 at 1.

On March 2, 2017, Gradillas e-mailed Crabtree reporting her progress on GCRI's SEC proposal. ECF No. 63-11. Gradillas advised: (1) she had attached two documents for the proposal, including a response to a "GO/NO GO FACTOR" discussed in the solicitation and updated material regarding other government contracting work done by GCRI; (2) she was "sending out questionnaires now"; (3) she was "going to start drafting the pricing"; and (4) Crabtree should "let [her] know if [she] would like [her] to draft anything else." *Id.*

On March 17, 2017, the due date for the SEC solicitation, Gradillas and Crabtree exchanged a series of e-mails, exchanging information, corrections, and finalizing GCRI's proposal. ECF Nos. 63-12–63-15. At 11:50:15 a.m., just under ten minutes before the SEC's submission deadline, Crabtree e-mailed Gradillas stating, "Have your email ready to drop in the documents. I'm going as fast as I can to finish the pricing but we will cut it to the last minute." ECF No. 63-15. At 12:00:05 p.m., Gradillas e-mailed Crabtree stating, "**PLEASE SENT IT YOURSELF NO TIME RIGHT NOW!!**" ECF No. 63-16.

At 12:03:18 p.m., Crabtree e-mailed GCRI's proposal, with the technical and pricing proposals (containing only attachment two) to the SEC, but reported, "We encountered technical errors this morning with Attachments 3 through 7 and are rapidly working to recreate them in the hopes that you will accept the late submission." ECF No. 63-17 at 1. At 12:04 p.m., Gradillas e-mailed the same incomplete version of GCRI's proposal to the SEC. ECF No. 69-24 at 3. At 1:05:48 p.m., Crabtree sent GCRI's complete submission to the SEC via e-mail, which included

the previously missing attachments three through seven. ECF No. 63-19 at 1. In this e-mail, Crabtree also stated, in pertinent part:

> I am the Contract Manager representative for [GCRI] and encountered technical difficulties this morning, which caused the submission to be late by a few minutes, as well as missing the remaining attachments. After a considerable amount of time on the phone with my IT department we were able to resolve the issue with my computer and I am thus providing all of the documents. . . . The delay was truly an issue on my end and I hate for the company to be penalized due to problems I incurred.

*Id.*; *see also* ECF No. 69-24 at 2 (stating, in a second e-mail to the SEC and Gradillas "[t]he [GCRI] submission being late is 100% the fault on my end" and requesting a bid deadline exception); ECF No. 69-21 at 14 (251:19–252:11) (discussing e-mail from Crabtree to Gradillas stating that she underestimated the time needed to complete the pricing spreadsheets).

In a March 23, 2017 letter, the SEC rejected GCRI's bid, noting that its request for proposals barred acceptance of untimely proposals. ECF No. 63-20; *see also* ECF No. 63-9 at 40 (noting that proposals were "due no later than 12:00 pm Eastern Standard Time (EST)" and "LATE PROPOSALS WILL NOT BE ACCEPTED.").

### III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure permits a party to move for summary judgment and directs a Court to grant such motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party "seeking summary judgment always bears the initial responsibility of informing the [court] of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted).

12

Subsequently, the burden shifts to the non-moving party to present specific facts demonstrating that a genuine dispute of material fact exists for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). For the evidence to present a "genuine" dispute of material fact, it must be "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When addressing a summary judgment motion, a court must view the facts, and inferences to be drawn from the facts, in the light most favorable to the non-moving party. *Id.* at 255. Nevertheless, if the non-moving party's evidence "is merely colorable, or is not significantly probative," *Anderson*, 477 U.S. at 249–50, or fails to rise above the level of "[m]ere unsupported speculation," *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2008), a well-supported motion for summary judgment may be granted.

## IV.    ANALYSIS

### A.    The claims asserted against defendant Crabtree in counts one and two should be dismissed.

The parties agree that Crabtree, as a Cherry Bekaert employee, acted at all times within the scope of her employment and on behalf of Cherry Bekaert in dealing with GCRI. *See* ECF No. 63 at 29–30; ECF No. 64 at 9. For this reason, and as confirmed by GCRI's counsel during the motion hearing, they concur in her dismissal as a defendant in this case. Accordingly, the undersigned recommends that counts one and two be **DISMISSED WITH PREJUDICE** as to Crabtree.

**B.    The limitation of liability provision of the engagement letter applies and limits the damages recoverable by GCRI for breach of contract.**

In count one, GCRI alleges that it suffered damages of not less than $12,205,421.00—the profits GCRI would have earned under the SEC solicitation, but for Cherry Bekaert's breach of contract. Compl. ¶¶ 51, 62.  Cherry Bekaert seeks summary judgment on count one, arguing the engagement letter's limitation of liability clause bars recovery of consequential damages, such as lost profits. ECF No. 63 at 19–21.  Cherry Bekaert also contends that the clause limits GCRI's recovery to losses no greater than the fees charged by Cherry Bekaert. *Id.*  Asserting that "[GCRI] . . . has not sued for fees incurred," Cherry Bekaert seeks the entry of judgment, as a matter of law, upon count one.[7]  *Id.* at 21.

GCRI argues that the limitation of liability clause is inapplicable to Cherry Bekaert and Crabtree's work on the 2017 SEC bid for multiple reasons discussed below.

**1.    The engagement letter constituted a contract, which the parties agreed to amend to encompass work involving the 2017 SEC bid proposal.**

Although Cherry Bekaert and GCRI agree that a contract existed between them relative to the 2017 SEC bid, they disagree over what comprises the contract and about its terms.  Having previously determined that Virginia law applies to the parties' dispute, ECF No. 45 at 7; ECF No. 52 at 4–5, the Court looks to Virginia contract case law for guidance.

The requisites of a valid contract are offer, acceptance, and valuable consideration. *Montagna v. Holiday Inns, Inc.*, 269 S.E.2d 838, 844 (Va. 1980).  A party suing for breach of contract bears the burden of establishing that a binding and enforceable agreement exists. *See Knox Energy, LLC v. Gasco Drilling, Inc.*, 2018 WL 2944408, at *2 (4th Cir. 2018) (citing

---

[7] In response to the Court's questions at the motion hearing, counsel for GCRI agreed that plaintiff seeks no damages other than any profits lost from the failed 2017 SEC project.

*Valjar, Inc. v. Maritime Terminals, Inc.*, 265 S.E.2d 734, 736 (Va. 1980)).  For a contract to be enforceable, there must be "mutual assent of the contracting parties to terms reasonably certain under the circumstances." *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 493 S.E.2d 512, 515 (Va. 1997) (citation and quotation marks omitted).  For a valid oral contract, "the terms of contract must be reasonably certain, definite and complete to enable the parties and the courts to give the agreement exact meaning." *Colonna's Shipyard, Inc. v. City of Key West*, No. 2:10cv63, 2011 WL 2634045, at *8 (E.D. Va. May 12, 2011) (citation and quotation marks omitted), *report and recommendation adopted*, 2011 WL 2633993 (E.D. Va. July 1, 2011).

"The question of whether [a valid] contract exists is a pure question of law." *Spectra-4, LLP v. Uniwest Commercial Realty, Inc.*, 772 S.E.2d 290, 293 (Va. 2015) (citation and quotation marks omitted).  Once it is determined a contract exists, its proper interpretation also presents a question of law.  *Bentley Funding Group, L.L.C. v. SK & R Group, L.L.C.*, 609 S.E.2d 49, 53 (Va. 2005).  Contract construction looks to the terms agreed upon by the parties, without adding terms they did not include.  *See Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984).  When a contract's terms are clear and unambiguous, a court must construe it in accord with its plain meaning.  *Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*, 463 S.E.2d 661, 664 (Va. 1995).  Thus, "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning.  No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *D.C. McClain, Inc. v. Arlington County*, 452 S.E.2d 659, 662 (Va. 1995).

15

**a.    GCRI's contentions concerning the scope and termination of the engagement letter are at odds with the terms of the contract and are not supported by the facts.**

These principles form the backdrop for the Court's examination of the parties' contentions for and against summary judgment on count one.  Cherry Bekaert argues the terms of the engagement letter govern and apply to the 2017 SEC solicitation work, ECF No. 63 at 19–24, without specifically addressing whether and how any agreement to perform the latter work affected the parties' contractual relationship.

In response, GCRI makes a series of arguments, starting with the claim the engagement letter applied only to the GSA project performed in 2012, ECF No. 64 at 10, and "the 2012 Letter terminated naturally at the end of 2012," *id.* at 22.  GCRI alleges that, in February 2017, GCRI and Cherry Bekaert "entered into another . . . contract, orally, by course of conduct [as evidenced by their business dealings over many years], and as evidenced by multiple writings . . . [in which Cherry Bekaert] agreed . . . [to] submit a proper complete bid to the SEC on [GCRI]'s behalf on or before the due date and time." Compl. ¶ 57.

GCRI's argument regarding the scope and termination of the engagement letter is at odds with the terms of that agreement, which was offered to and accepted by GCRI and supported by valid consideration.  Pursuant to the engagement letter, Cherry Bekaert agreed to serve as "consultants for [GCRI]" and "provide general consulting and accounting assistance as requested by the Company[,] [which] . . . consulting assistance may include, but not be limited to, general accounting assistance, advising on pricing and indirect rate structures, advising on general government contract matters and proposals, advising on tax matters, and other areas as mutually agreed." ECF No. 63-2 at 1.  Rather than limiting the parties' relationship to the GSA project, the parties' "letter of arrangement" broadly contemplates that Cherry Bekaert would provide

16

multiple types of assistance to GCRI, to be "performed to achieve mutually agreed upon objectives." *Id.* Consistent with the provision of varied services in pursuit of multiple objectives, the engagement letter further specifies that "[t]he actual personnel who perform the work will vary depending on the areas of expertise . . . [needed] to complete the engagement." *Id.* And, that any fees charged therefor, "will be billed periodically as charges are incurred . . . ." *Id.* at 3.

Based upon such provisions, the Court concludes that the engagement letter constituted a broad umbrella agreement under which Cherry Bekaert agreed to provide multiple services, upon request, to GCRI for various projects. GCRI's claim that the engagement letter applied exclusively to the 2012 GSA project conflicts with the engagement letter's terms.[8]

Nor does GCRI's conclusory assertion that the contract expired in 2012 find support in the record.[9] *See* ECF No. 69-20 at 6–7 (363:11–365:6). The engagement letter specifies that "[u]nless terminated sooner in accordance with its terms, this arrangement shall terminate on the completion of [Cherry Bekaert's] services hereunder. This arrangement may be terminated by

---

[8] Further, GCRI's apparent reliance upon Gradillas' deposition testimony concerning pre-contracting conversations with Cherry Bekaert's John Carpenter and her desire to retain the firm solely to assist GCRI with the GSA project, ECF No. 69-20 at 7 (364:6–365:6), is barred by the parol evidence rule because it seeks to constrict the written terms of the parties' agreement. *See Amos v. Coffey*, 320 S.E.2d 335, 337 (Va. 1984) (holding "parol evidence of *prior or contemporaneous* oral negotiations or stipulations is inadmissible to vary, contradict, add to, or explain the terms of a complete, unambiguous, unconditional, written instrument") (citation and quotation marks omitted); *see also Centex Constr. v. Aestar Ins. Co.*, 448 F. Supp. 2d 697, 712 (E.D. Va. 2006).

[9] GCRI argues "the 2012 Letter expired after completion of services in 2012," ECF No. 64 at 24, but the facts suggest the GSA work continued well after 2012. Although Crabtree completed the registration in 2012, it apparently remained necessary to regularly update the information contained in the registration with quarterly sales data. *See* ECF No. 63-4 at 1, 6 (requesting on January 10, 2013 that Crabtree submit last quarter's sales to GSA). Cherry Bekaert appears to have continued to perform this work in 2013, 2014, 2015, 2016, and 2017. *See* ECF 63-5 at 2–4 (reflecting time entries for quarterly GSA submissions and reporting).

either party at any time by giving written notice to the other party not less than thirty calendar days before the effective date of termination." ECF No. 63-2 at 3. By its terms, the engagement letter continued in force so long as Cherry Bekaert continued to serve as GCRI's consultant, absent written notice of termination by either party. The undisputed facts establish that GCRI continued to call upon and Cherry Bekaert provided consulting services through the time of the 2017 SEC project. *See* ECF No. 63-5.

Nor is there any evidence indicating that GCRI (or Cherry Bekaert) sought to terminate the contract by giving written notice of the same at any time before the 2017 SEC project arose. It was only after the 2017 SEC project ran aground that Cherry Bekaert gave written notice to GCRI in June 2017 of its intent to terminate the engagement letter contract. ECF No. 69-22 at 8 (133:1–135:6). Therefore, GCRI's contention that the engagement letter terminated in 2012, which flows from its cramped contract interpretation, is neither "significantly probative," *Anderson*, 477 U.S. at 249–50, nor sufficiently supported, *see Francis*, 452 F.3d at 308, to create a genuine dispute of material fact on this point.[10] *See also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (stating "plaintiff's own opinions and conclusory allegations do not have sufficient 'probative force to reflect a genuine issue of material fact'") (citations omitted).

> **b.** **Notwithstanding GCRI's claims about changes in Crabtree's status and the nature of the services performed, the engagement letter applied to the 2017 SEC project.**

Next, GCRI argues the engagement letter does not apply to Cherry Bekaert's work on the 2017 SEC solicitation for several loosely-related reasons predicated on the notion that the work

---

[10] Due to the foregoing analysis, the Court need not address whether the engagement letter was a contract of indefinite duration terminable at will. *See* ECF No. 64 at 25–26 (citing *Miller v. SEVAMP, Inc.*, 362 S.E.2d 915 (Va. 1987)).

at issue fell outside the scope of the engagement letter. In this regard, GCRI contends that GCRI and Cherry Bekaert's course of conduct, after completing the 2012 GSA project, proves the engagement letter no longer applied and shows that parties "entered into subsequent agreements for various 'separate and discrete' projects" on an iterative basis. ECF No. 64 at 24. GCRI also contends that Crabtree's establishment as GCRI's contract manager in 2015, and her continuation in that role at the time of the 2017 SEC work, fell outside the scope of the engagement letter. *Id.* at 23–25. Finally, GCRI asserts that Cherry Bekaert and Crabtree's later agreement(s) to take on the responsibility for preparing and submitting GCRI's bids fell outside of the limitation contained in the "services" term of the engagement letter. *Id.* at 22–25. These contentions are without merit for the following reasons.

The parties' agreements after March 27, 2012 about performing additional tasks fell within, rather than outside, the scope of the engagement letter. It provided that Cherry Bekaert would "provide general consulting and accounting services as requested by" GCRI on matters pertaining to accounting, taxes, pricing, government contracts, bid proposals, "and other areas as mutually agreed." ECF No. 63-2 at 1. Stated another way, the very kinds of tasks that GCRI contends rendered the engagement letter a nullity were expressly contemplated to be performed upon request and mutual agreement.

Nor does the parol evidence rule bar the supplementation of a written contract via subsequent agreements for tasks such as those agreed to be performed by Cherry Bekaert for GCRI. As noted in *Reid v. Boyle*, 527 S.E.2d 137, 144–45 (Va. 2000), "[a] contract in writing . . . may be dissolved or varied by a new oral contract, which may or may not adopt as part of its terms some or all of the provisions of the original written contract." (citation and quotation marks omitted); *see also Piedmont Mt. Airy Guano Co. v. Buchanan*, 131 S.E. 793,

795 (Va. 1926) (stating "the parties to a simple contract in writing . . . [may] add to, change, or modify it, or vary or qualify its terms [and] . . . [i]n such case, the contract must be proved partly by the written and partly by the subsequent oral contract which has thus been incorporated into and made a part of the original one"). Here, the parties agreed to modify the engagement letter pursuant to requests for and agreements to provide additional consulting services that continued through and included the 2017 SEC bid proposal. Construing the facts in the light most favorable to GCRI, Cherry Bekaert agreed, as part of its work under the engagement letter, to prepare and submit GCRI's bid for the 2017 SEC contract.[11]

Next, Crabtree's status as GCRI's "contract manager" does nothing to alter the foregoing analysis. Although Crabtree continued to be employed by Cherry Bekaert, in the latter part of 2015, Crabtree and Gradillas agreed that Crabtree would use the title of contract manager. ECF No. 69-20 at 5 (334:4–21); ECF No. 69-21 at 12 (244:11–16). According to Gradillas, she consented to Crabtree's request to use the title when representing GCRI to government agencies, and said, "I want you to do everything. Please handle it all." ECF No. 69-20 at 5 (334:4–12). What this entailed in practical terms is less than clear, as Gradillas testified that she "believe[d she] had an understanding, general sense. There may have been some description." ECF No. 69-20 at 5 (334:13–17). Regardless, the record shows that Crabtree used the term, for example, in an e-mail to the SEC on March 17, 2017, when she identified herself as "Contract Manager representative for [GCRI]" and explained she "encountered technical errors" leading to GCRI's

---

[11] No evidence exists that, in offering and contracting for this new task, GCRI sought to modify or remove other pre-existing terms of the engagement letter.

incomplete initial bid proposal.[12]  ECF No. 63-19.  Crabtree used her Cherry Bekaert e-mail address to send this explanation and closed by including her contact information and identifying herself as a "Senior Manager – Government Contractor Services" at Cherry Bekaert's office in Virginia Beach, VA.  *Id.*  No evidence exists suggesting that, in her role as contract manager, Crabtree was employed by, independently contracted with, or received compensation from GCRI, apart from her employment with Cherry Bekaert.

GCRI argues that Crabtree's 2015 elevation to the status of a contract manager not only placed her well outside of the consulting services specified in the engagement letter, but also displaced the engagement letter's specification of John Carpenter as the engagement principal. ECF No. 64 at 15–17.  These arguments are inconsistent with the expansive and open-ended contract language used to describe the services to be provided.  The engagement letter states such "consulting and accounting assistance" services "may *include, but not be limited to,* . . . advising on pricing and indirect rate structures, advising on general government contract matters and proposals, advising on tax matters, *and other areas as mutually agreed*."  ECF No. 63-2 at 1 (emphases added).  While Crabtree's role as contract manager and in preparing and submitting GCRI bid proposals arguably exceeded the "advising" services specifically enumerated, the assumption of such a role and the taking of such actions appear to fall within the scope of the overall "general consulting and accounting *assistance*" Cherry Bekaert agreed to provide upon request.  *Id.* (emphasis added).  Moreover, if any ambiguity about the latter point remains, the contract's listing of available services in general rather than comprehensive terms, subject to

---

[12] Although Crabtree identified herself to the SEC as GCRI's contract manager *after* submitting the bid, the contemporaneous emails and deposition testimony contain no discussion about Crabtree's status as contract manager when the 2017 SEC project was added to the contract.

expansion upon request and by mutual agreement, defeats the claim that any changes in Crabtree's status or duties fell outside the purview of the contract.

Nor, as GCRI contends, did Crabtree's role as a contract manager somehow nullify John Carpenter's status as engagement principal, "responsible for assuring the overall quality, value, and timeliness of [the] services." *Id.*; *see* ECF No. 64 at 25 (arguing that "Mr. Carpenter was no longer acting to supervise the work, as specified in the 2012 Letter"). With respect to the 2017 SEC project, Carpenter testified as follows. When asked if he agreed that he "[wasn't] involved at all on the 2017 project that Ms. Crabtree and Ms. Gradillas agreed to do," Carpenter stated "I think that's fair to say, correct." ECF No. 69-22 at 6 (114:6–9). Continued questioning revealed, however, that: (1) Carpenter continued to work for Cherry Bekaert at that time; (2) he and Crabtree "did discuss the bid at least a couple of times in the week it was due"; (3) they also spoke about whether Crabtree had sufficient resources and she made no request for more; and (4) he "did not participate in that bid to ensure it was finished timely." *Id.* at 6–7 (116:11–117:13). For purposes of the pending motion, it is immaterial whether Carpenter properly performed the responsibilities noted in the engagement letter. Instead, what matters is the absence of any genuine issue about Carpenter's continuing status as engagement principal during the 2017 SEC project through June 2017, when he sent a contract termination notice to GCRI. *See id.* at 8 (133:1–17). Thus, Crabtree's identification of herself to government agencies as GCRI's contract manager fails to support the claim the provisions of the engagement letter no longer applied.

Finally, GCRI argues the engagement letter does not apply to the 2017 SEC project because the letter defined the term "services" as "expressly exclud[ing] 'implementation and communication' of advice, like preparing and submitting bids to the government, and does not

22

apply to work done by Crabtree as Contract Manager." ECF No. 64 at 22. The contract term at issue states: "Our services may include advice and recommendations; but all decisions in connection with the implementation and communication of such advice and recommendations will be your responsibility." ECF No. 63-2 at 2.

This provision is inapplicable for two reasons. First, it only applies to "advice and recommendations." It neither addresses nor precludes Crabtree (and Cherry Bekaert) from serving as contract manager or from preparing and submitting bids. *See id.* (specifying "our services *may include* advice and recommendations"). Second, and more importantly, the provision identifies which contracting party bore responsibility for making *decisions* needed to implement and communicate any advice and recommendations. It allocated to GCRI, the expected recipient of advice and recommendations from its consultant, the authority to decide how to carry out and tell others about such matters.

This reservation of certain decision-making authority in GCRI did not preclude Cherry Bekaert from agreeing to prepare and submit GCRI's 2017 SEC bid, under the umbrella of the engagement letter. As shown by her testimony, Gradillas apparently was the one who discovered the SEC's request for proposals and who thereafter contacted Cherry Bekaert and *decided*, in the absence of prior advice, who would prepare and submit the bid and who would pay for such work. *See* ECF No. 69-19 at 6 (123:6–124:18) (discussing her telephone call to "offer the work to them so that they could prepare the proposal for us and . . . submit it and . . . send us a bill"); *see also* ECF No. 63-8.

Further, GCRI's conclusory assertion that "[d]efendants implemented their own advice in preparing the 2017 Bid and communicated the Bid to the SEC," ECF No. 64 at 22, ignores the fact that Gradillas directed, and Cherry Bekaert agreed, to undertake the tasks of preparation and

23

submission. Nor does GCRI identify the alleged "advice" Cherry Bekaert gave and implemented on its own. Instead, the testimony cited by GCRI for this point merely recites Gradillas' answers to assorted questions indicating, among other things, that she hired Crabtree (and Cherry Bekaert) for the 2017 SEC project for their pricing expertise and she expected them to perform that work as part of the job. *Id.* at 14, ¶ 9. To the extent that Cherry Bekaert implemented any such advice and recommendations, it did so at the direction and with the consent of GCRI's owner.[13]

> c. **The changes in Cherry Bekaert's pricing and name fail to signify that the engagement letter did not apply to the 2017 SEC project.**

As additional grounds for its claim that each project following the 2012 GSA project constituted a new contract, distinct from the engagement letter, GCRI asserts that Cherry Bekaert not only "charged new rates for [such] new and different projects," but also changed its name. ECF No. 64 at 24–25. As noted above, the fees charged by Cherry Bekaert for Crabtree's work for GCRI increased from $265.00 (prior to August 1, 2012), to $280.00 (as of November 30, 2012), to $325.00 per hour (as of March 2017). *See infra* p. 8. GCRI contends that, because the 2017 rates exceeded those listed in the engagement letter, it no longer governed projects occurring after the 2012 GSA project, including the 2017 SEC project.

The Court disagrees. With respect to fees, the engagement letter specifies that Cherry Bekaert would charge GCRI fees "based on the time spent at our *established* hourly rates," as

---

[13] Lastly, it bears noting that GCRI's contention that actions such as bid preparation and submission fell outside the scope of the "advice and recommendations" permitted by the engagement letter is belied by the very kinds of services initially performed by Crabtree pursuant to that agreement. During the 2012 GSA project, on December 5, 2012, Crabtree e-mailed Gradillas advising that "[e]verything is now registered, entered and uploaded [and] [a]ttached is a screenshot with confirmation of the successful upload[,] * * * [and] I have also attached the instructions for you, for future reference." ECF No. 63-4 at 2.

adjusted for other factors independent of the time on task. ECF No. 63-2 at 3 (emphasis added). It then identified "*currently effective [hourly] rates* for consulting services . . . *effective through August 1, 2012*" depending on the title of the Cherry Bekaert employee providing such services. *Id.* at 4 (emphases added). For example, the currently effective hourly rates in March 2012 ranged for a "Partner/Principal" from $300.00 to $395.00 per hour, and for a "Manager/Sr. Manager" from $250.00 to $350.00 per hour. *Id.* Beneath this generic listing, the letter also specified a "specific individual rate[]" for Crabtree of $265.00 per hour. *Id.*

In light of these provisions, the Court is satisfied the changes in the hourly rates billed to GCRI's time fail to signify the end of the engagement letter. As noted by Cherry Bekaert, ECF No. 70 at 6–7, the engagement letter expressly contemplates rates may be changed by virtue of its references to currently established rates then in effect through August 1, 2012. Consistent with such provisions, and apparently without complaint from GCRI, Cherry Bekaert billed Crabtree's time at an increased $280.00 per hour rate by November 2012 for work on the GSA project, which GCRI admits fell within the engagement letter.[14] ECF No. 70-2 at 1. Moreover, and during the entirety of the parties' relationship, the rates charged for Crabtree's time as a government consultant, *see* ECF No. 63-1 at 1, and as a senior manager, *see* ECF No. 63-17 at 1, nevertheless remained in the ranges ($200.00 to $350.00 and $250.00 to $350.00, respectively) generically specified in the engagement letter.

Finally, the Court notes that GCRI's claim that numerous, separate, and additional contracts, including the 2017 SEC contract, were formed orally or by course of conduct between the parties, ECF No. 69-20 at 7 (365:7–366:1), lacks detail regarding important particulars,

---

[14] The Court declines to adopt, as illogical and inconsistent with the contract as a whole, a construction that permits pricing changes for the generically titled personnel listed therein, but prohibits changes to Crabtree's specified hourly rate. Moreover, if such an interpretation applied, it would only support a claim for breach of the contract, rather than its nullification.

including price. *See Colonna's Shipyard, Inc.*, 2011 WL 2634045, at *8 (noting that an oral contract requires terms sufficiently certain that a court may ascertain them). GCRI presents no facts about any agreement regarding the fees to be charged for the 2017 SEC project, aside from asserting that Cherry Bekaert "charged new rates . . . which [GCRI] agreed to pay . . . ." ECF No. 64 at 24–25. The absence of such data regarding an important contract term supports the conclusion that the engagement letter remained in force.

As noted above, Cherry, Bekaert & Holland, L.L.P., changed its name to Cherry Bekaert, LLP, effective January 1, 2013, by applying to North Carolina's Secretary of State for a certificate of amendment. ECF No. 63-7 at 1–3. Although not asserting the "name change dissolve[d]" the contract, GCRI argues it constitutes "further evidence that the 2012 Letter was not an ongoing contract." ECF No. 64 at 25 n.35. For the reasons discussed above about the nature of the parties' continuing contractual relationship, the Court rejects this claim. Further, in the absence of contrary authority supplied by GCRI, the Court concludes the name change failed to work a change in the parties' continuing contractual rights and obligations. *See Hess Energy, Inc. v. Lightning Oil Co.*, 276 F.3d 646, 650 (4th Cir. 2002) (stating, "[i]n addition the fact that Statoil changed its name to Hess Energy had no bearing on its [contractual] obligations to Lightning"); *Grunley Walsh U.S., LLC v. Raap*, No. 1:08-CV-446, 2009 WL 1298244, at *9 (E.D. Va. May 6, 2009) (recognizing "[t]he change of a corporation's name is not a change of identity of a corporation and has no effect on . . . [its] property, rights, or liabilities") (citations and quotation marks omitted), *aff'd*, 386 F. App'x 455 (4th Cir. 2010); *Wright-Caesar Tobacco Co. v. A. Hoen & Co.*, 54 S.E. 309, 311 (Va. 1911) (refusing to overturn a jury verdict finding a successor company liable for the contract obligation of its predecessor, following appropriate corporate action and acceptance of the amendment by the State Corporation Commission and

26

where the successor was "but a continuation" of the first company); *see also* 6 Fletcher Cyc. Corp. § 2456 ("A mere change in the name of a corporation generally does not destroy the identity of the corporation, nor in any way affect its rights and liabilities"); *Elastic Wonder, Inc. v. Posey*, 179 F. Supp. 3d 307, 319 (S.D.N.Y. 2016) (applying New York law to reach the same conclusion).

> d. **A meeting of the minds occurred with respect to the engagement letter, including its limitation of liability clause.**

For purposes of the pending motion, the Court finds that Cherry Bekaert agreed, as part of its engagement contract with GCRI, to prepare and submit the 2017 SEC bid proposal. The Court, therefore, next considers whether the contract's limitation of liability clause bars GCRI from recovering profits lost on the SEC contract. GCRI argues the clause's liability limitation is inapplicable because Cherry Bekaert failed to call it to GCRI's attention and it was not a negotiated term.[15] ECF No. 64 at 26–27.

The "Limitation on Damages" clause specifies that "[i]n no event shall either you or we be liable for consequential, special, indirect, incidental, punitive, or exemplary damages, costs, expenses or losses in an excess of our fees." ECF No. 63-2 at 2. Under Virginia law, consequential damages include lost profits. *See Wachovia Bank Nat. Ass'n v. Preston Lake Homes, LLC*, 750 F. Supp. 2d 682, 693 n.9 (W.D. Va. 2010) (stating "lost profit damage claims are considered consequential damages under Virginia law") (citing *NAJLA Assocs. v. William L. Griffith & Co.*, 480 S.E.2d 492 (Va. 1997); *R.K. Chevrolet, Inc. v. Hayden*, 480 S.E.2d 477 (Va. 1997); and *Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862 F.2d 1044, 1049 (4th Cir. 1988)). GCRI does not contend otherwise.

---

[15] GCRI also argues that the clause has no application to its negligence claim, ECF No. 64 at 27–29, which the Court discusses below.

Rather, GCRI relies on deposition testimony from Carpenter and Crabtree indicating they never discussed this limitation on damages with Gradillas and Gradillas' testimony that she signed the engagement letter without discussing its terms with anyone at Cherry Bekaert. *See* ECF No. 64 at 27 n.42 (reciting deposition testimony). In reliance on this deposition testimony and the lack of any express acknowledgement, such as initialing, confirming that Gradillas read and agreed to the clause allegedly inconspicuously placed in the contract, GCRI argues the absence of negotiation precludes enforcement of the clause. *Id.* at 26–27.

A binding contract requires "mutual assent of the contracting parties to terms reasonably certain under the circumstances." *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture,* 235 F. Supp. 2d 485, 490 (E.D. Va. 2002) (citation and quotation marks omitted). "When determining whether mutual assent exists to a degree sufficient to form an enforceable agreement, Virginia courts ascertain whether a party assented to the terms of a contract from that party's words or acts, not from his or her unexpressed state of mind." *McKay Consulting Inc. v. Rockingham Mem'l Hospital,* 452 F. App'x 331, 336 (4th Cir. 2011) (citing *Wells v. Weston,* 326 S.E.2d 672, 676 (Va. 1985)).

The facts, taken in the light most favorable to GCRI, indicate that Gradillas communicated with Carpenter about obtaining Cherry Bekaert's assistance in securing GSA registration for her firm. *See* ECF No. 63-1 at 2; ECF No. 69-20 at 6–7 (363:11–364:11). Soon after, Carpenter signed an engagement letter prepared on Cherry Bekaert stationary on March 22, 2012, and Crabtree e-mailed a copy to Gradillas on March 23, 2017 at 10:50 a.m. ECF No. 63-1; ECF No. 63-2. In the e-mail, Crabtree discussed various services Cherry Bekaert could provide and noted she "attached a general consulting engagement letter which outlines the working relationship." ECF No. 63-1 at 1. At the end of the four-page letter, Carpenter wrote:

28

> We . . . believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please don't hesitate to contact me via phone . . . or email . . . . If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

ECF No. 63-2 at 4. After receiving the letter, Gradillas waited four days before taking action to accept or reject it or seek a modification of its terms. From the deposition testimony noted above, the Court infers she contacted neither Carpenter nor Crabtree with questions about the letter. On March 27, 2012, beneath words stating "[t]he foregoing letter fully describes the services required and is accepted by us" and adjacent to the words "[a]ccepted by," Gradillas signed and dated the letter on behalf of GCRI, as its president. ECF No. 63-2 at 4. After she did so, it is undisputed that contract performance began.

These facts suffice to establish a meeting of the minds. At the time, as a long-time court reporter and the sole owner of a court-reporting business founded in 2001, *see* ECF No. 67 at ¶¶ 1–2, Gradillas was neither a stranger to law nor commerce. She sought out and engaged the consulting services of Cherry Bekaert. Compl. ¶¶ 14–15. And, her dealings with Carpenter and Crabtree prior to signing, as well as her conduct in waiting and then endorsing the engagement letter, constitute strong evidence of her intent to be bound by its terms.

Those terms were set out in a relatively brief, four-page document, which Gradillas nowhere denies reading. Half-way down the letter's second page, is the clause, applicable to both parties, from which GCRI now seeks to be relieved. Far from being inconspicuous or otherwise obscured, the clause is set out in the same font and typeface as the rest of the letter and is located in the body of the letter beneath a separate sub-heading plainly titled "Limitation on Damages." Having signed the letter after receiving sufficient time to review and seek advice

thereon, GCRI is bound by all of its terms.[16] *See Reid,* 527 S.E.2d at 143 (noting that courts should not "permit parties to be released from the obligations which they have assumed if this can be ascertained with reasonable certainty from language used, in light of all the surrounding circumstances") (citation and quotation marks omitted); *see L & E Corp. v. Days Inns of Am., Inc.,* 992 F.2d 55, 59 (4th Cir. 1993) (noting "[w]here . . . experienced parties agree to allocate unknown or undeterminable risks, they should be held to their bargain; courts, or juries should not be permitted to rewrite the agreement") (citation and quotation marks omitted).

The cases cited in GCRI's brief, not involving Virginia case law, do not compel a contrary conclusion. For example, *Evans v. Singer,* 518 F. Supp. 2d 1134, 1137–38 (D. Ariz. 2007), discusses Arizona law and whether, on a motion to dismiss for failure to state a claim, the facts pled by plaintiffs concerning the absence of negotiation over the release of a *negligence* claim were sufficient to permit the case to proceed. *Cf. Reibold v. Simon Aerials, Inc.,* 859 F. Supp. 193, 198 (E.D. Va. 1994) (discussing Virginia law and noting "[w]hile no party may ever disclaim liability for negligence, one may disclaim contractual liability" subject to claims of unconscionability).

GCRI also cites to *Tokyo Ohka Kogyo Am., Inc. v. Huntsman Propylene Oxide LLC,* 35 F. Supp. 3d 1316, 1319–24 (D. Or. 2014), which considered the applicability of a limitation of liability clause in a contract dispute, in relation to a U.C.C. provision adopted in Texas and Oregon. The court ruled that a boilerplate liability limiting clause attached to a credit

---

[16] GCRI does not argue the clause is unconscionable. Nor could it effectively do so. In Virginia, "parties may limit their risk of loss through contract." *Kocinec v. Pub. Storage, Inc.,* 489 F. Supp. 2d 555, 558 (E.D. Va. 2007) (citation omitted); *see also Ripley Heatwole Co. v. John E. Hall Elec. Contr., Inc.,* No. L04-1556-01, 2005 WL 4827398, *2 (Va. Cir. Ct. 2005) (noting that a "contractual provision specifically limiting a party's liability" embodies "one of the essential purposes of contract law—the freedom of parties to limit their risks in commercial transactions").

application, entered into without negotiation two to three years before extensive negotiations leading to multiple, other, detailed agreements, failed its essential purpose and enforcing it would be unconscionable, in part, due to the "presence of deception, overreaching, or sharp business practice . . . ." *Id.* at 1320–24, 1327–28, 1333–34.   Given these factual differences, the case has no bearing upon this dispute.

The same is true for another Texas cased cited by GCRI.  *See Berge Helene Ltd. v. GE Oil & Gas, Inc.*, 830 F. Supp. 2d 235, 273–74 (S.D. Tex. 2011) (rejecting seller's invocation of a limitations of damages clause contained in a gas compressor data sheet and denying summary judgment, absent proof the parties treated the data sheet as a contract after due negotiation in which the clause was brought to the buyer's attention), *superseded in part on other grounds*, 896 F. Supp. 2d 582 (S.D. Tex. 2012).

Finally, the one Virginia case cited by GCRI, *In re LCS Homes, Inc.*, 103 B.R. 736, 747–48 (Bankr. E.D. Va. 1989), is inapposite as it involved a purported oral agreement, where competing witness testimony about its terms led the court to conclude there was neither a meeting of the minds nor an express contract.

Because the limitation of damages clause in the engagement letter applies to this dispute and bars GCRI's attempt to recover profits lost from the 2017 SEC project, the undersigned recommends Cherry Bekaert's motion for summary judgment on count one be **GRANTED**.

C.     **Count two's claim of professional negligence arises from the parties' contractual relationship and should be dismissed with prejudice.**

Count two of the complaint alleges that, as a result of its engagement, Cherry Bekaert entered into a "professional client relationship with [GCRI]" giving rise to professional and fiduciary duties that were breached in the mishandling of the 2017 SEC bid. Compl. ¶¶ 63–65. Further, GCRI alleges that, "[b]ut for [Cherry Bekaert's] professional negligence, more likely

than not [GCRI] would have submitted a successful bid to the SEC and . . . been awarded the SEC contract." *Id.* at ¶ 67. As a result, GCRI asserts that it suffered compensatory damages of "not less than $12,205,421," *id.* at ¶ 69, the same sum sought to be recovered in count one, *id.* at ¶ 62.

Cherry Bekaert seeks summary judgment on count two contending that it owed no duty to GCRI independent of the parties' contractual relationship and no claim of professional negligence can survive. ECF No. 63 at 34–35. In its written response, GCRI contends that Cherry Bekaert owed a duty independent of the contract; that is, the duty flowing from its role "as Contract Manager, responsible for handling all aspects of government contracts for [GCRI]," including "to timely and properly prepare and submit" the SEC bid. ECF No. 64 at 38. At the hearing, counsel argued that this duty also encompassed the duty to be honest with GCRI if Cherry Bekaert could not perform the task.

The issue of whether a party claiming injury stemming from a professional relationship may pursue a negligence claim, in addition to a breach of contract action, has been frequently litigated in Virginia. To pursue the former, courts consistently require proof that "'the duty alleged to have been tortiously breached must be a common law duty, not a duty arising between the parties solely by virtue of a contract.'" *VA Timberline, LLC v. Land Mgmt. Grp., Inc.*, 471 F. Supp. 2d 630, 632 (E.D. Va. 2006) (quoting *Holles v. Sunrise Terrace, Inc.*, 509 S.E.2d 494, 497 (Va. 1999)). Whether such a common law duty exists is a question of law for a court. *Id.*

Because a professional contract of employment implicitly includes "'the professional's duty to exercise the care of those ordinarily skilled in the business, and to exercise a reasonable degree of care, skill, and dispatch in carrying out the business for which [one] is employed,'" when such duties arise "only by virtue of . . . contract," a negligence claim premised thereon

32

cannot survive. *Hewlette v. Hovis*, 318 F. Supp. 2d 332, 335–37 (E.D. Va. 2004) (discussing the applicability of tort principles in addressing a contract action for legal malpractice) (quoting *O'Connell v. Bean*, 556 S.E.2d 741, 743 (Va. 2002)); *see VA Timberline, LLC*, 471 F. Supp. at 634 (applying concepts from legal malpractice cases discussing a professional's duty of care in dismissing a professional negligence claim against soil scientists because it "ar[ose] solely from [the parties'] contractual relationship").

Although the parties before the Court dispute what comprised their contract, they agree they entered into one or more contracts. They also agree that their contractual relationship included Cherry Bekaert's provision of consulting services for the 2017 SEC project. For purposes of this motion, "[t]he contract for the 2017 SEC Bid was for [Cherry Bekaert] to prepare and submit [GCRI's] Bid as Contract Manger to the SEC . . . ." ECF No. 64 at 14. It is this contractual relationship, rather than any common law duties, that gives rise to GCRI's professional negligence claim. The alleged negligence here, the contract manager's failure to timely prepare and submit the 2017 SEC bid, flows from and is co-extensive with Cherry Bekaert's contractual duties. This point is underscored by the fact that GCRI seeks the same sum in recovery for both its contract and negligence claims. Compl. ¶¶ 62, 69. Also, to the extent any "special relationship" existed between GCRI and its contract manager, Cherry Bekaert, that relationship was a product of the contract and fails to support a tort claim. *See O'Connell*, 556 S.E.2d at 743 (holding that claim for an attorney's breach of a fiduciary duty constituted a claim for breach of contract). Because "[a] tort action cannot be based solely on a negligent breach of contract," *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998), the undersigned recommends that Cherry Bekaert's motion for summary judgment be **GRANTED** as to count two.

33

**D.**   **In light of the recommended dismissal of counts one and two, no need exists to address the proposed, alternative ground for summary judgment.**

Defendants alternatively seek summary judgment on counts one and two arguing that GCRI's proof of causation and damages is speculative as a matter of law.  ECF No. 62-1 at 24–32.  In light of the foregoing analysis, and because defendants have since filed a motion pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) with respect to the causation and damages experts relied upon by GCRI, ECF No. 85, the undersigned declines to address the proposed, alternative basis for summary judgment.

## V.   RECOMMENDATION

For the foregoing reasons, the Court recommends that defendants' motion for summary judgment, ECF No. 62, be **GRANTED** as to both counts one and two of the complaint.

As putative defendants John Does 1–50 have not been identified or served with the complaint, the Court recommends that they be **DISMISSED WITH PREJUDICE.**

## VI.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within 14 days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within 14 days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

34

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J.  Krask
United States Magistrate Judge

Norfolk, Virginia
November 6, 2018

35